```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/20/2017
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
:
WAYNE VEGA,                                                :
:
                Plaintiff,                         :
:         14-CV-8104 (VSB)
         -v-                                   :
:         **MEMORANDUM & OPINION**
WARDEN DUFFY et al.,                                       :
:
                Defendants.                      :
:
-----------------------------------------------------------X

Appearances:

Wayne Vega
*Plaintiff pro se*

Omar H. Tuffaha
Corporation Counsel, City of New York
New York, New York
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff brings this action under 42 U.S.C. § 1983 against Warden Duffy, Deputy Warden Moses, and Jane Does #1 and #2 (collectively, "Defendants"), seeking an order that Defendants reinstate his original, non-Red I.D. status, and seeking compensatory damages for injuries allegedly incurred when Plaintiff was put into enhanced restraints. Before me is Defendants' unopposed motion for summary judgment and to strike Plaintiff's amended complaint. (Doc. 27.) Defendants' motion to strike Plaintiff's amended complaint is DENIED. However, because (1) Plaintiff had no right to a pre-restraint hearing, (2) Plaintiff fails to allege or proffer facts to support a claim that Defendants acted in a manner that was grossly disproportionate or involved the wanton infliction of pain, and (3) any injuries suffered by Plaintiff were de minimis, I find that Plaintiff's constitutional rights were not violated.

Therefore, Defendants' motion for summary judgment is GRANTED.

## I. Factual Background[1]

Plaintiff Wayne Vega, who is proceeding pro se, was an inmate in the custody of the New York City Department of Correction ("DOC") from March 18, 2013 until March 13, 2015. (Defs.' 56.1 ¶ 7.)[2] From June 11, 2014 until July 21, 2014, Plaintiff was housed at the George Motchan Detention Center ("GMDC"). (*Id.* ¶ 8.) On July 21, 2014, he was transferred to the Otis Bantum Correctional Center ("OBCC"). (*Id.*) On March 13, 2015, Plaintiff was transferred to the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), and, to the Court's knowledge, currently remains in DOCCS custody. (*Id.* ¶ 9.)

On August 18, 2013, while in DOC custody, Plaintiff received an infraction for assaulting two corrections officers, and pled guilty to that conduct at an infraction hearing held on August 27, 2013. (*Id.* ¶ 10.) Because of the nature of the infraction, which involved a violent assault on staff, Plaintiff was placed on "Enhanced Restraint Status." (*Id.* ¶ 11.) He was served with a notice that stated that a determination had been made that he should be restrained using security mitts, handcuffs, waist chains, and leg irons during movement to and from all service areas or places of escort. (*Id.*)[3] There is no evidence in the record that Plaintiff appealed this determination.

Plaintiff alleges that, on June 19, 2014, while waiting to be transported to a criminal court appearance in the Bronx, an intake captain, Jane Doe #1, told Plaintiff that his transportation card

---

[1] The facts described in this section are presented for background purposes, and the City's submissions and the facts contained in this section are supported by the facts in the record.

[2] "Defs.' 56.1" refers to Defendants' Local Civil Rule 56.1 Statement of Undisputed Material Facts. (Doc. 29.)

[3] Plaintiff does not dispute that he was on Enhanced Restraint Status or that he received notice and a hearing regarding that status. (*See* Pl.'s Dep. (Doc. 30-1) 27:20-29:22.)

2

listed him as a "Red I.D. inmate."[4]  (*Id.* ¶ 15.)  Because of this designation, on June 19, 2014, Plaintiff was placed in enhanced restraints for his courthouse visit.  (Compl. at 2, ¶ 2; Pl.'s Dep. 12:1-13:17.)[5]  Specifically, Plaintiff alleges that when he went to court, he was handcuffed in the front, placed in a waist-chain and security mitts, and his feet were shackled.  (Defs.' 56.1 ¶ 17; Pl.'s Dep. 16:19-17:11.)  He remained in the enhanced restraints until his return to the prison, GMDC, later that day.  (Defs.' 56.1 ¶ 17; Pl.'s Dep. 16:19-17:11.)

Plaintiff further testified that the mitts were "very tight on me" and that his "back was hurting" as a result of the enhanced restraints.  (Pl.'s Dep. 19:1-4.)  Plaintiff testified that he went to "sick call" the next day and was given four ibuprofen, but did not seek any further treatment. (*Id.* 19:17-20:10, 33:13-17.)  According to Plaintiff the enhanced restraints left "prints on my wrist and I felt like a little numbness but I didn't really pay it no mind and I went about my business as I handle this lawsuit."  (*Id.* 20:11-15.)  The numbness went away after two days.  (*Id.* 20:16-19.)

Plaintiff also alleges that on June 27, 2014, while awaiting transport to court, he was told by the intake captain on duty that day, Jane Doe #2, that his transportation card listed him as a Red I.D. status inmate.  (*See* Compl. at 3, ¶ 2; Pl.'s Dep. 21:3-13.)  However, after Plaintiff objected to this designation, the intake captain made a phone call, and then told Plaintiff that he would travel without enhanced restraints.  (Compl. at 3, ¶ 2; Pl.'s Dep. 21:5-23.)  Plaintiff was not placed in enhanced restraints on June 27, 2014.  (Compl. at 3, ¶ 2; Pl.'s Dep. 21:5-23.)  After he returned from court that day, Plaintiff was given an identification card that designated him as

---

[4] The DOC uses Red I.D. status "to identify prisoners who have been found in possession of a weapon or using a weapon in prison."  *Williams v. New York City*, No. 03-CV-3543 (NRB), 2005 WL 1084585, at *1 (S.D.N.Y. July 15, 2005).

[5] "Compl." refers to Plaintiff's complaint, filed on October 6, 2014.  (Doc. 1, "Complaint.")  The citations in this Order to Plaintiff's Complaint refer both to the numbered paragraph and the page number for clarity.

a Red I.D. status inmate by a male corrections officer, and was told when he asked what it was for that he should "handle it." (Pl.'s Dep. 22:19-23:1.)[6] Later Plaintiff handed in the Red I.D. card and got his "regular" identification card returned to him. (*Id.* 23:24-24:14.)

Plaintiff was never placed in enhanced restraints again, and June 19, 2014 was the only date on which he was placed in enhanced restraints as a Red I.D. status inmate while incarcerated in DOC custody. (*Id.* 23:21-24:1, 33:10-12.)

## II. Procedural History

Plaintiff commenced this action by filing his Complaint on October 6, 2014. (Doc 1.) In accordance with my *Valentin* Order, filed November 19, 2014, (Doc. 7), Defendants, on January 16, 2015, provided Plaintiff with the names and service addresses for the Jane Doe defendants. (*See* Doc. 10.) As provided in the *Valentin* Order, Plaintiff had thirty days from receipt of the names and service addresses to amend his Complaint to add these defendants. (Doc. 7 at 2 ("Within thirty days of receiving this information, Plaintiff must file an amended complaint naming the Jane Doe defendants.").) Plaintiff did not amend the Complaint within thirty days, nor did he seek additional time to add these defendants, and Defendants Warden Duffy and Deputy Warden Moses answered the Complaint on March 26, 2015. (Doc. 13.) Without seeking Defendants' consent or obtaining my leave, Plaintiff filed an amended complaint on September 25, 2015. (Doc. 20.)[7]

---

[6] Plaintiff does not name this male corrections officer as a defendant in either the Complaint or the amended complaint.

[7] By letter filed on May 29, 2015, Plaintiff requested "a copy of the original Amendment Complaint I had previously sent. I need to review the information I originally submitted and it has also come to my attention that I now have the name of the Captain originally referred to as John or Jane Doe in said complaint." (Doc. 18.) While Plaintiff refers to an "original Amendment Complaint," because he sought to add the name of the captain to the complaint he references, I interpret this letter to say that Plaintiff was requesting a copy of his original complaint and, as of May 29, 2015, he had not sought to file any amended complaint. Plaintiff was mailed a copy of the Amended Complaint Form on June 3, 2015, but it does not appear that he was sent a copy of his original complaint. (*See* Dkt. Entry June 3, 2015.)

4

On November 3, 2015, Defendants filed a pre-motion letter in anticipation of filing a motion for summary judgment and requesting that I strike Plaintiff's Amended Complaint. (Doc. 21.) A pre-motion conference was held on November 12, 2015, but Plaintiff did not attend the conference; it was reported by personnel at the prison that Plaintiff refused to leave his cell and "[did not] feel like talking." (Doc. 24; *see also* 11/12 Tr. 2:4-5.)[8] After the pre-motion conference, I entered an order instructing the Defendants to file a single brief in support of both their motion for summary judgment and motion to strike Plaintiff's Amended Complaint. (Doc. 24.)

On December 31, 2015, Defendants filed their motion for summary judgment and to strike the Amended Complaint, (Doc. 27), which included a memorandum of law, (Doc. 28), Rule 56.1 Statement, (Doc. 29), declaration with exhibits attached, (Doc. 30), and a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment," (Doc. 31). Plaintiff's opposition was due on or before February 22, 2016. (*See* Doc. 26.) However, Plaintiff did not file an opposition, so on April 20, 2016, I issued an Order giving Plaintiff until May 27, 2016 to file an opposition. (Doc. 32.) The Order stated that if an opposition was not filed, I would "consider Defendants' motions unopposed, and [] decide the motion without the benefit of Plaintiff's opposition." (Doc. 32.) To date, Plaintiff has not filed a response, nor has he filed any documents in connection with this case since filing the Amended Complaint on September 25, 2015.

### III. Legal Standard

#### A. *Motion for Summary Judgment*

Summary judgment is appropriate when "the parties' submissions show that there is no

---

[8] "11/12 Tr." refers to the transcript of the pre-motion conference held on November 12, 2015. (Doc. 33.)

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, the moving party bears the burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

When considering a motion for summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010) (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005)). In cases involving a pro se litigant, the court must go one step further and liberally construe the pro se party's pleadings "to raise the strongest arguments that they suggest." *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

"In the case of a *pro se* [litigant], the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Federal Exp.*, 766 F.3d 189, 198 (2d Cir. 2014). A district court is required to examine the record and legal theories in greater detail when the non-moving party is unrepresented. *See id.* at 196–97. In undertaking such an examination, "the court may rely on

6

other evidence in the record even if uncited." *Id.* at 194 (citing Fed. R. Civ. P. 56(c)(3)). "A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . ." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). "And, of course, the court must determine whether the legal theory of the motion is sound." *Jackson*, 766 F.3d at 194.

An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) (citation and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1-800 Bear gram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'" (quoting *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001))).

**B.** *Motion to Strike the Amended Complaint*

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend its pleading with leave of the court; the Rule dictates that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a); *see also Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 283 (2d Cir. 2000) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Generally, amendments are favored because they "tend to facilitate a proper decision on the merits." *Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396 (E.D.N.Y. 1998) (citation and internal quotation marks omitted).

Where a proposed amendment adds a new party, the propriety of amendment is governed

7

by Federal Rule of Civil Procedure 21, which provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Rule 21 provides broad discretion to the Court to permit the addition of a party at any stage in the litigation. *Sullivan v. W. N.Y. Residential, Inc.*, No. 01-CV-7847 (ILG), 2003 WL 21056888, at *1 (E.D.N.Y. Mar. 5, 2003). Although Rule 21

> contains no restrictions on when motions to add or drop parties must be made, the timing of the motion may influence the court's discretion in determining to grant it. Thus, the court typically will deny a request that comes so late in the litigation that it will delay the case or prejudice any of the parties to the action.

*City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 308 (2d Cir. 2006) (citation omitted).

"Motions to strike [a pleading] are generally disfavored, but are within the district court's sound discretion." *Lamoureux v. Anazaohealth Corp.*, 250 F.R.D. 100, 102 (D. Conn. 2008). "The Federal Rules of Civil Procedure reflect the policy that pleadings should be treated liberally, and that a party should have the opportunity to support its contentions at trial." *SEC v. Lorin*, 869 F. Supp. 1117, 1120 (S.D.N.Y. 1994). Moreover, "[a] *pro se* plaintiff who brings a civil rights action should be 'fairly freely' afforded an opportunity to amend his complaint." *Satchell v. Dilworth*, 745 F.2d 781, 785 (2d Cir. 1984) (quoting *Bradley v. Coughlin,* 671 F.2d 686, 690 (2d Cir. 1982)); *see also Holmes v. Goldin*, 615 F.2d 83, 85 (2d Cir. 1980) ("A pro se plaintiff, particularly one bringing a civil rights action, should be afforded an opportunity fairly freely to amend his complaint."). "[A] *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Satchell*, 745 F.2d at 785 (finding that the district court abused its discretion in refusing to accept a pro se plaintiff's proposed amended complaint).

## IV. Discussion

Here, Plaintiff did not submit an opposition to Defendants' motion; therefore, I consider the motion unopposed. I have examined the legal theories underlying Defendants' motion and I have reviewed the materials submitted to determine whether the 56.1 statement is supported by admissible evidence, and conclude that the facts discussed in this decision are supported by admissible evidence in the record.

### A. *The Amended Complaint*

I will begin by addressing Plaintiff's untimely filing of the Amended Complaint. Defendants, characterizing the Amended Complaint as a "proposed amended complaint," (*see generally* Defs.' Mem.),[9] move to strike it, arguing that Plaintiff did not seek leave of Defendants or from me, as required by Federal Rule of Civil Procedure 15(a)(2), and that, even had Plaintiff sought leave, the amendment would be prejudicial to Defendants under the standards set forth in Rule 21. Plaintiff's Amended Complaint contains fewer factual allegations than the Complaint and does not attach the three exhibits attached to the Complaint,[10] but it does add the name of Defendant Jane Doe #1, Captain Avis Murphy, ("Captain Murphy"), whose name had been provided to Plaintiff in response to my *Valentin* Order. (*See* Am. Compl. 1; Doc. 10.)

Because I find that, in the interest of justice, Plaintiff's Amended Complaint should be accepted, Defendants' motion to strike the Amended Complaint is DENIED. Still, "[b]ecause the plaintiff is proceeding *pro se*, and appears to have intended to supplement the Original Complaint with the Amended Complaint, [I may] consider the relevant factual allegations in the

---

[9] "Defs.' Mem." refers to the Memorandum of Law in Support of Defendants' Motion for Summary Judgment and in Support of Motion to Strike the Proposed Amended Complaint. (Doc. 28.)

[10] The Complaint attaches two inmate grievance forms, one submitted on June 21, 2014 concerning the June 19, 2014 incident, (Compl. at 6), and one submitted on June 28, 2014 concerning the June 27, 2014 incident, (Compl. at 7). Plaintiff also attaches a letter he wrote to Warden Duffy, dated June 30, 2014, concerning his identification as a Red I.D. status inmate. (Compl. at 8.)

Original Complaint, and attached exhibits, for purposes of the current motion." *Cooksey v. Global Grind Digital*, No. 14-cv-7146 (JGK), 2016 WL 5108199, at *2 (S.D.N.Y. Sept. 19, 2016) (collecting cases). In addition, to the extent the Amended Complaint relies on the documents attached to the Complaint, I consider those attachments in connection with the current motion. *See Hunt v. Arthur Kill Corr. Facility*, No. 11-CV-2432 (RRM)(LB), 2012 WL 7658364, at *1 n.1 (E.D.N.Y. Oct. 9, 2012) (considering documents attached to original complaint, even though "an amended complaint completely replaces the original complaint," where pro se litigant's amended complaint relied on documents but failed to attach them), *report and recommendation adopted*, No. 11-CV-2432 (RRM)(LB), 2013 WL 828483 (E.D.N.Y. Mar. 6, 2013).

### B. *Motion for Summary Judgment*

#### 1. Background of Red I.D. Status

The Second Circuit in *Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001), summarized the use of Red I.D. status and enhanced restraints by prisons:

> The Red I.D. policy is designed to prevent violence when inmates are moved outside of [DOC] jails. . . .
>
> Inmates who have been found to possess a weapon while in the [DOC's] custody are assigned Red I.D. status. A Red I.D. detainee must wear a red identification card which enables [DOC] staff to determine that the detainee is subject to special attention during jail searches and strip frisks. When Red I.D. detainees are moved anywhere outside their facility, their hands are placed in black tubes termed "security mitts." Although the exact types of restraints apparently vary, typically the cuffs are attached to a waist chain and the hands are cuffed behind the back facing outwards. The detainee may also be placed in leg irons. During the detainee's courthouse visit, he may be shackled in this manner for up to fourteen hours.

264 F.3d at 181.

In the district court's decision below in *Benjamin*, the court held that certain procedural

protections were required for designation of an inmate as Red I.D. status. *See Benjamin v. Kerik*, 102 F. Supp. 2d 157, 171 (S.D.N.Y. 2000), *aff'd sub nom. Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001). In light of the restrictive, and potentially injurious, enhanced restraints utilized during transportation of a Red I.D. status inmate, Judge Baer concluded that the imposition of Red I.D. status without providing meaningful subsequent review violates the inmate's constitutional rights, and that subsequent review should conform with the review provided in *Wolff v. McDonnell*, 418 U.S. 539 (1974).[11] *See id.* at 171, 175. After receiving from counsel proposed procedural protections, Judge Baer issued an order requiring that

> within 72 hours after placing an inmate in Red I.D. . . . status, the [DOC] afford the inmate a hearing pursuant to *Wolff*; (b) within 72 hours of the hearing, a written decision be prepared by the hearing officer and given to the inmate; (c) appeals from placement in Red I.D. . . . status be reviewed within seven days; (d) inmates be given the opportunity to seek further review based upon good cause; and (e) inmates subjected to Red I.D. . . . status receive monthly medical reviews.

*Benjamin*, 264 F.3d at 183. In affirming the decision, the Second Circuit emphasized that the ruling did not impose any restrictions on the DOC's ability to initially place an inmate in enhanced restraints, but instead required only "subsequent," "after-the-fact" procedural protections. *Id.* at 188–90. As the Second Circuit explained, "the government's interest here initially outweighs that of the individual [and] . . . is satisfied by the imposition of restraint." *Id.* at 190. "Judge Baer's order fully recognized the importance of the state interest in being able to impose Red I.D. . . . status immediately. The court required no prior hearing. It imposed no restrictions on the immediate imposition of heightened restraints. The court required only that subsequent process be granted." *Id.* (internal citation omitted).

---

[11] In *Wolff*, the Supreme Court held that, before deprivations of prisoners' liberty interests can occur, there must be notice, a written statement of the facts supporting the charge (to be used in the event of review), and a hearing where the prisoner is able to present witnesses and evidence on his behalf, subject to the discretion of the prison authorities. *See Wolff*, 418 U.S. at 563–66.

11

A DOC directive titled "Red ID Status and Enhanced Restraint Status Due Process," (DOC Directive # 4518R-A, "Directive"),[12] outlines these procedural requirements for designating an inmate as Red I.D. status. The Directive was adopted on December 28, 2000, following the district court's ruling in *Benjamin*. *See Toliver v. New York City Dep't of Corr.*, Nos. 10 Civ. 822(RJS)(JCF), 5355(RJS)(JCF), 2013 WL 3779125, at *5 (S.D.N.Y. July 8, 2013) (adopting report and recommendation).

### 2. Joinder of Captain Murphy

Plaintiff filed the Amended Complaint on September 25, 2015, in which he named Captain Murphy, identified as Jane Doe #1 in his Complaint, as a defendant. (Doc. 20.) Prior to this filing, and in response to a request from Plaintiff, the Pro Se Office in the District Court for the Southern District of New York mailed a service package, which included the forms necessary to serve the Amended Complaint on all defendants. (*See* Dkt. Entry Apr. 30, 2015.) Among other things, this service package included instructions on filing an amended complaint, a copy of the Order of Service, change of address postcards, a copy of my Individual Rules and Practices in Civil Cases, and instructions on how to file a motion and opposition. However, to date, Captain Murphy has not been served with the Amended Complaint. (Defs.' Mem. 3.)

Federal Rule of Civil Procedure 4(m) dictates that, where timely service is not made after notice to the plaintiff, the Court may dismiss the action without prejudice. "Further, a plaintiff has a general obligation to prosecute his case diligently, and, if he fails to do so, the Court may dismiss the action under Fed. R. Civ. P. 41(b), for failure to prosecute." *Powell v. Dep't of Corr.*, No. 00 Civ. 5260 (Lake), 2001 WL 1502551, at *1 (S.D.N.Y. Oct. 29, 2001) (citing *Lyell*

---

[12] DOC Directive # 4518R-A, while seemingly unavailable on the DOC website, is attached to the Tuffaha Declaration as Exhibit B. (Doc. 30-2.)

*Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 43 (2d Cir. 1982)).

Here, it is clear that Plaintiff failed to serve Captain Murphy with the Amended Complaint, and the record reflects that Plaintiff is not prosecuting this action diligently. Therefore, pursuant to Rule 4(m), dismissal without prejudice is proper. However, even assuming Captain Murphy were properly a party in this action, any claims against her fail as a matter of law, as detailed below.

### 3. Plaintiff's Due Process Claim

Plaintiff's Fourteenth Amendment claim arises from his placement in enhanced restraints on June 19, 2014 because of Plaintiff's identification as a Red I.D. status inmate. On that date, Plaintiff alleges that he was informed by the intake captain on duty—"Jane Doe #1" in the Complaint, and Captain Murphy in the Amended Complaint—that his transportation card listed him as being on Red I.D. status, and that he therefore would have to be placed in enhanced restraints for his court appearance. (Compl. at 2–3, ¶ 2; Pl.'s Dep. 12:1-13:17.) Plaintiff confirmed in his deposition that this was the only time, either before or after June 19, 2014, that he was placed in enhanced restraints when transported outside of the facility, for a courthouse visit or otherwise. (Pl.'s Dep. 23:21-24:1, 33:10-12.) Nonetheless, Plaintiff asserts a due process violation because he was never given notice or a hearing in connection with his Red I.D. status designation.

No prior hearing, or any other process, is required before the initial placement of an inmate in enhanced restraints pursuant to a Red I.D. status designation. *See Benjamin*, 264 F.3d at 188–90. Rather, all that is required is that DOC provide "'subsequent review of the justification for imposing' the extra restraints that accompany Red ID status." *Vega v. Western*, No. 10 Civ. 6131 (DAB)(GWG), 2011 WL 4600599, at *2 (S.D.N.Y. Oct. 6, 2011) (quoting

*Benjamin*, 264 F.3d at 190), *report and recommendation adopted*, No. 10 Civ. 6131 (DAB), 2012 WL 523617 (S.D.N.Y. Feb. 16, 2012). Indeed, the Directive dictates that the requirement for a due process hearing is triggered upon "service of notice on an inmate of his or her placement into Red ID . . . Status . . . ." (Directive §IV(E).) Thus, "the obligation to hold a hearing arises only *after* an inmate is identified as Red ID." *Vega*, 2011 WL 4600599, at *3 (emphasis in original) (citing *Benjamin*, 264 F.3d at 190).

June 19, 2014 was the first time that Plaintiff was treated as a Red I.D. status inmate. Therefore, Plaintiff was not entitled to notice or a hearing prior to his placement in enhanced restraints on June 19, 2014. While the notice and subsequent hearing required by *Benjamin* and the Directive would be required if Plaintiff were indeed designated as Red I.D. status, after June 19, 2014, Plaintiff was never again placed in enhanced restraints and there is no indication that Plaintiff was ever officially designated as a Red I.D. status inmate.[13] Although Defendants explain why Plaintiff was, apparently erroneously, told he was a Red I.D. status inmate on June 19, 2014, Plaintiff successfully contested the "designation" and obtained his "regular" identification card back. (Pl.'s Dep. 23:24-24:14.) Because Plaintiff received the relief that would been provided by a notice and a hearing, and thereby remedied the apparent error of his designation as Red I.D. status, I find that a notice and hearing were not required. Further, I find that Plaintiff's allegations that he was given a Red I.D. card for a period of time before having his general identification returned, (*id.* 22:22-24:14), and that he was "afraid that [he] will be placed back into the enhanced restraints every time" he went to court, (Compl. at 3, ¶ 2), do not implicate a liberty interest requiring due process protections.

---

[13] Although Plaintiff alleges that he was given a Red I.D. status identification card, (Pl.'s Dep. 22:19-23:1), the ease with which he was able to return said card, (*id.* 23:24-24:14), suggests that Plaintiff was not officially designated as a Red I.D. status inmate, (*see* Directive § IV(A)(1) (detailing the multiple steps required for designating an inmate as Red I.D. status)).

14

#### 4. Plaintiff's Eighth Amendment Claim

Plaintiff also asserts a "violation of the 8th Amendment's cruel and unusual punishment statute by subjecting [him] to a form of punishment that was not properly prescribed by th[e] administration." (*See* Compl. at 4, ¶ 3.) While unclear, it appears that Plaintiff's Eighth Amendment claim is premised on the use of enhanced restraints, in general, or, on a claim of excessive force for the injuries suffered as a result of the enhanced restraints. Plaintiff's Eighth Amendment claim fails under both scenarios.

"Restraints on an inmate do not violate the [Eighth Amendment] unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.'" *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346 (1980)). As the Second Circuit recognized in *Benjamin v. Fraser*, the post-restraint procedures reflect "the importance of the state interest in being able to impose Red I.D. . . . status immediately. . . . The court required only that subsequent process be granted." 264 F.3d at 190. Although Plaintiff's Red I.D. status designation on June 19, 2014 appears to have been in error, Plaintiff does not allege and there are no facts to support a finding that the Defendants acted in a manner that was grossly disproportionate or involved the wanton infliction of pain.

To the extent Plaintiff's Eighth Amendment claim is premised on allegations of excessive force, the claim also fails. To succeed on a claim for excessive force, a Plaintiff must present sufficient evidence to establish that, (1) subjectively, a defendant had a wanton state of mind at the time of the alleged incident, and (2) objectively, the amount of force used was sufficiently serious or harmful. *See Sims v. Artuz*, 230 F.3d 14, 20–21 (2d Cir. 2000) ("A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components—one subjective,

15

focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect."). When an excessive force claim is based on tight handcuffing, Plaintiff must suffer more than temporary injury. "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005) (citing *Burchett v. Kiefer*, 310 F.3d 937, 944–45 (6th Cir. 2002)). The injury requirement is "particularly important," *Sachs v. Cantwell*, No. 10 Civ. 1663(JPO), 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012), because in order "to be effective, handcuffs must be tight enough to prevent the arrestee's hands from slipping out," *Abdul-Rahman v. City of New York*, No. 10 Civ. 2778, 2012 WL 1077762, at *7 (E.D.N.Y. Mar. 30, 2012) (quoting *Esmont*, 371 F. Supp. 2d at 214). "Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, [and] brief numbness from tight handcuffing . . . ." *Jackson v. City of New York*, 939 F. Supp. 2d 219, 231 (E.D.N.Y. 2013) (quoting *Lemmo v. McKoy*, No. 08-CV-4264 (RJD), 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011)).

As an initial matter, Plaintiff does not allege, and there is no evidence in the record to support, the subjective component of an excessive force claim. With regard to injury, Plaintiff testified that the only injury the enhanced restraints caused him was "like a little numbness but I didn't really pay it no mind," for which received four ibuprofens the following day but sought no further medical attention. (Pl.'s Dep. 19:1-20:22.) Plaintiff's discomfort and brief numbness is precisely the type of de minimis injury that fails to satisfy the objective component of an excessive force claim. *See Jackson*, 939 F. Supp. 2d at 231.

With regard to actions taken by the individual defendants, Plaintiff has not alleged and

16

there is no evidence in the record that Defendants Duffy or Moses were involved in his handcuffing, and Plaintiff alleges only that Captain Murphy confirmed to the transportation officer that Plaintiff was listed as a Red I.D. inmate and therefore required enhanced restraints. (Compl. at 2, ¶ 2; Pl.'s Dep. 12:1-13.) Plaintiff's failure to allege personal involvement of Defendants Murphy, Duffy, and Moses means that they cannot be held liable for any Eighth Amendment claim. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (quoting *Colon*, 58 F.3d at 873). In addition, with regard to Defendant Murphy, personal liability under § 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g.*, *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*."). Therefore, Plaintiff's tight handcuffing claim fails.

Moreover, Plaintiff has not alleged that any correctional staff placed him in enhanced restraints "maliciously or sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010) (internal quotation marks omitted). Rather, Plaintiff was placed in enhanced restraints because his transportation card listed him as being on Red I.D. status, which is designed to protect against violence on inmates and staff. Plaintiff complains of the restraints remaining in place while he was in court and during lunch, but he specifically alleges in his Complaint that he was told by the unnamed corrections officers that "the restraints had to stay on [him] for security reasons," (*see* Compl. at 3, ¶ 2), and not for any improper motive. In sum, there is no evidence presented that could allow a reasonable jury to find for Plaintiff on his Eighth Amendment claim; as such, Plaintiff's Eighth Amendment claim fails.

### 5. Qualified Immunity

Qualified immunity shields a government officer from liability under § 1983 "when they perform discretionary functions if either (1) their conduct did not violate clearly-established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that [their] acts did not violate these clearly established rights." *Emerson v. City of New York*, 740 F. Supp. 2d 385, 390–91 (S.D.N.Y. 2010) (quoting *Tenenbaum v. Williams*, 193 F.3d 581, 596 (2d Cir. 1999)). "The objective reasonableness test is met—and the defendant is entitled to immunity—if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Thus, the qualified immunity defense "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341.

Here, as discussed above, there are no facts in the record that could support the conclusion that Plaintiff's constitutional rights were violated. However, even if I found that there remain disputed questions of fact concerning whether Plaintiff suffered some manner of constitutional deprivation, all Defendants would be shielded from liability by qualified immunity because "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

There is no clearly established right to due process prior to an inmate's initial placement in enhanced restraints pursuant to a Red I.D. status designation. *See Benjamin v. Fraser*, 264 F.3d at 190 ("Judge Baer's order fully recognized the importance of the state interest in being able to impose Red I.D. . . . status immediately. The court required no prior hearing. It imposed

18

no restrictions on the immediate imposition of heightened restraints. The court required only that subsequent process be granted. . . . We find the district court was entirely reasonable in requiring subsequent procedures that conform to the requirements of *Wolff*." (citations omitted)). Further, subsequent review is required for the purpose of insuring that "restraints be terminated if instituted without reason." *Id*. at 182–83. After June 19, 2014, Plaintiff was never again placed in enhanced restraints pursuant to a Red I.D. status designation. Thus, to the extent he was mistakenly listed on the transportation card as a Red I.D. status inmate on June 19, 2014, and issued a Red I.D. status identification card, the mistake was clearly corrected and a hearing was not warranted. Moreover, in acting pursuant to the list of Red I.D. status inmates she was provided, Captain Murphy's actions in identifying Plaintiff as a Red I.D. status inmate, especially in light of the purpose of Red I.D. status restraints in preventing violence, were objectively reasonable.

In sum, Warden Duffy, Deputy Warden Moses, and Captain Murphy may not be held liable in this case because their actions are shielded from liability under the qualified immunity doctrine.[14]

---

[14] While Plaintiff does not purport to bring a *Monell* claim for municipal liability, to the extent he names Defendants in the Complaint "personally and in their official capacity," (Compl. 1), any municipal liability claims fail in light of my finding that there was no constitutional deprivation. "In order for a municipality to be held liable for a constitutional violation, the violation must occur because of an official municipal custom, policy or practice which causes the violation of the plaintiff's rights." *Williams v. New York City*, No. 03 Civ. 3543 (NRB), 2005 WL 1084585, at *15 (S.D.N.Y. July 15, 2005) (citation and internal quotation marks omitted). As claims against individual municipal employees in their official capacities are tantamount to claims against the municipality itself, the same analysis applies. *See, e.g.*, *Hafer v. Melo*, 502 U.S. 21, 25 (1991). Further, I note that the operative Amended Complaint names the Defendants only individually. (*See* Am. Compl. 1.)

19

## V. Conclusion

For the reasons stated above, Defendants' motion to strike the amended complaint is DENIED, and Defendants' motion for summary judgment is GRANTED. The Clerk's Office is instructed to mail a copy of this decision to the pro se Plaintiff, terminate the open motion at Document 27, and close the case.

SO ORDERED.

Dated: September 20, 2017
     New York, New York

_____
Vernon S. Broderick
United States District Judge